BOSTON'S CHILDREN FIRST, Ann F. Walsh, President, Nicholas Anderson, a minor by his parent and next friend, Ellen Dowd, Ellen Dowd, Michael Gattozzi, a minor, by his parents and best friends Joseph Gattozzi, Patrice Gattozzi, John K. O'Toole, Jr., a minor, by his parents and next friends John O'Toole, Sr., Rose O'Toole, Kathleen McCoy, a minor, by her parents and next friends, Carol McCoy, John McCoy, Plaintiffs,

v.

CITY OF BOSTON, Thomas Menino, Mayor of the City of Boston Thomas Payzant, Superintendent of the Boston Public Schools Boston School Committee Elizabeth Reilinger, Dr., Boston School Committee Chairperson, Alfred J. Harris, School, Committee Vice–Chairperson Felix D. Arroyo, School Committee Member, Robert Gittens, School Committee Member, Susan Naimark, School Committee Member, Marchelle Raynor, School Committee Member, William Spring, School Committee Member, Defendants.

No. Civ.A. 99–11330–NG.

United States District Court,
D. Massachusetts.

Aug. 10, 1999.

Chester Darling, Boston, MA, for plaintiffs.

Frances S. Cohen, Diane DiIanni, Hill & Barlow, Boston, MA, Merita A. Hopkins, City of Boston Law Department, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

## TABLE OF CONTENTS

I. BACKGROUND .................................................249
   A. The Parties ...........................................249
   B. The Breadth of Plaintiffs' Claims .....................249
   C. The Plan .............................................251
   D. The Timing of the Law Suit ...........................253
II. LEGAL ANALYSIS ............................................253
   A. Laches ...............................................254
      1. Unreasonable Delay ..............................254
      2. Prejudice .......................................256
   B. Preliminary Injunctive Relief .........................257
      1. Likelihood of Success on the Merits .............257
   C. Balance of Potential Harms ...........................261
   D. Public Interest ......................................261
III. CONCLUSION ...............................................262

This case raises critical issues, issues which have rocked this city, and indeed this nation, for the past twenty-five to thirty years. The Plaintiffs challenge the constitutionality of the Defendants' use of race in its student assignment plan, the Controlled Choice Student Assignment Plan ("the Plan"). They seek broad emergency relief, barring the use of race as a factor in any way in student assignments for the 1999–2000 school year.[1] In the light of the evolving law of equal protection, their challenge is a fair one. But rather than bringing this case at a time when it could have been carefully litigated, Plaintiffs have brought it at the eleventh hour, weeks before the first day of class is scheduled to begin. The settled expectations of the children of Boston about where they will attend elementary school, the longstanding commitments of working parents to childcare arrangements, and the academic plans of the faculty hang in the balance.

If the law were clear and the remedy obvious, I would not hesitate to order the relief the Plaintiffs have requested, no matter what the cost, just as courts have done when these issues were raised years ago by minority Plaintiffs. But this case is different—at least in its preliminary stages: While the law has been changing in the past decade, while race preferential remedies have been questioned more and more, essential issues have not been resolved. Nor is this Plan the product of a renegade group of officials proceeding willy-nilly to implement their personal biases. Whether one agrees with the Plan or not, whether it will ultimately be seen as constitutional or not, it is clear that it emerged from the efforts of men and women of good will trying to steer a course between what seemed to be conflicting constitutional obligations.

It is precisely because of the significance of these issues, their complexity, not to mention the substantial disruption that the proposed injunction will cause to the children of Boston, that preliminary relief is entirely inappropriate. After careful review of the motion, the opposition thereto, the arguments of counsel at the hearing in open court, and the entire record, undeveloped as it is, I find that this motion for preliminary relief must be **DENIED**.[2]

1. As discussed below, on July 14, 1999, the Boston School Committee voted to modify the Choice Plan by removing race as a factor in making student assignments, effective for September 2000.

2. The Plaintiffs initially filed a Motion for Recusal pursuant to 28 U.S.C. § 455(a). I

## I. BACKGROUND

### A. The Parties

Plaintiffs consist of four individuals, together with a non-profit organization.[3] The four individual Plaintiffs are the parents of white Boston school-aged children:

1. Ellen Dowd is the mother of Nicholas Anderson who is eight years old and enrolled in the 3rd Grade at the Taylor School. He has been a student at Taylor since his initial assignment in 1997–98 and has not applied for a transfer for 1999–2000.

2. Joseph and Patrice Gattozzi are the parents of Michael Gattozzi who is six years old and is enrolled in 1st Grade at the Roosevelt School. Michael selected this school as his first choice school for K2 in 1998–99, and has not applied for transfer for 1999–2000. Patrice Gattozzi is also one of the co-founders of the organizational plaintiff, Boston's Children First.

3. Carol and John McCoy are the parents of Kathleen McCoy who is presently enrolled in private school. She has not applied for assignment to any public school for 1999–2000.

4. John and Rose O'Toole are the parents of John O'Toole Jr. John is four years old and is presently on the waiting list for placement in K1 for 1999–2000.

The organizational plaintiff is Boston's Children First ("BCF"), directed by Ann Walsh. BCF is a non-profit advocacy and membership organization whose stated purpose and activities include quality of education issues and obtaining equality in student assignment within the Boston Public Schools without regard to race, color, creed or national origin. Members of the organization have school-aged children attending, or seeking to attend, public school within the city of Boston.

The Defendants in this case include the City of Boston, Mayor Thomas M. Menino, School Superintendent Thomas Payzant, and the Boston School Committee members: Elizabeth Reilinger, Alfreda Harris, Felix Arroyo, Robert Gittens, Susan Naimark, Marchelle Raynor and William Spring.

### B. The Breadth of Plaintiffs' Claims

Plaintiffs' challenge is extraordinarily broad. They seek to eliminate the use of race as a factor in the assigning of students to individual schools in any aspect of the Plan, at any stage.[4] They would prohibit not only methods that may be dubbed "race preferential"—giving preference to members of one race over another—but also any methods that are simply "race conscious"—official action that takes into account the impact on minorities. They challenge the way in which the Defendants have divided up the school zones, from which the children apply for schools, osten-

---

**DENIED** this motion in open court on August 2, 1999. *See* Memorandum, August 10, 1999.

**3.** The Plaintiffs also request that this Court certify the action as a class action under Fed. R.Civ.P. 23(a) and 23(b)(2). The putative class consists of "all children who (a) live in the city of Boston; (b) are of school age; (c) were members of those racial or ethnic groups who are excluded from consideration for assignment to seats within the various schools in the Boston School System on the basis of their race." *First Amended Complaint*, June 28, 1999. In subsequent filings, the Plaintiffs further defined the class as "all white students who are attending and applying to attend the Boston Public Schools."

*Reply to Defendants' Memorandum in Opposition to Motion for a Preliminary Injunction,* July 30, 1999.

The Defendants oppose the class certification because (1) the Plaintiffs themselves lack standing, so they cannot bring a suit on behalf of others; (2) the class representative claims are not "typical" of the alleged claims of class members; (3) class representatives do not adequately represent the interests of the class members; and (4) there are no questions of law or fact common to the class.

**4.** In addition to constitutional claims, the Plaintiffs also claim violations of Title VI of the Civil Rights Act of 1964, and Amendment 111 to the Constitution.

sibly to maximize diversity. They seek to delete any reference to race or ethnicity in school assignments, including "the software programs, or any other process utilized for the assignment of students by the defendants." [5]

Plaintiffs claim that their chances of winning are so strong (the "likelihood of success on the merits" test) and the harm that would accrue to them if injunctive relief is not granted so dramatic (the "irreparable harm" test), that I must order the relief they seek immediately.

Defendants argue, first, that emergency relief is precluded by the doctrine of lach-

es. The Plaintiffs, they claim, have unreasonably delayed seeking this relief until the very eve of the new school year and that, as a result, they are profoundly disadvantaged. They cannot properly defend against the Plaintiffs' challenges, which raise complex issues, and if relief is granted, settled expectations and plans of the school children of Boston, their parents, the faculty, will be disrupted. Nor, Defendants claim, can the Plaintiffs establish that they would likely succeed on the merits of their claim because the Plaintiffs, they allege, do not have standing to sue at all.[6]

**5.** The relief requested consists of the following:

1) To immediately eliminate the use, by the Defendants, of zones that are designed on the basis of race or ethnicity.

2) To immediately eliminate the use of race or ethnicity in any phase of school selections, school assignments, program selections, seat allocations, student transfers and wait listing by the named Defendants.

3) That the software programs, or any other process utilized for the assignment of students by the Defendants, shall contain no instructions that refer to race or ethnicity or permit access to the race or ethnic identity of any student.

4) To immediately provide access to representatives from Boston's Children First and Citizens for the Preservation of Constitutional Rights, Inc., to any and all records, processes, computer programs, reports and documents under the control of the Defendants, their agents, subsidiaries, contractors, or any political subdivision of the City of Boston that will enable the monitoring of every detail of every school assignment, school selection, program selection, seat allocation, student transfer, and wait listing for every student and putative student in the Boston Public School System. The Defendants shall pay a reasonable hourly rate and all costs of the above described monitoring of the defendants' activities as deemed appropriate by the Court.

5) To immediately re-open the assignment of students and the allocation of seats for all levels of Kindergarten and First Grade.

6) To immediately re-calculate all wait lists for all grade levels without considerations of race or ethnicity.

7) To immediately reassign students at all grade levels who applied for transfers for the 1999–2000 school year without regard for race or ethnicity.

8) To immediately and aggressively utilize every media outlet and the mail to inform the parents and caretakers of Boston school children that the Boston Public Schools will not be using race or ethnicity in its assignments of all Kindergarten, First Grade, student transfers and wait lists. And further, that the Boston Public Schools will accept registrations from those who did not apply for the 1999–2000 school year, or who declined the race based assignments they had received.

9) To immediately design and implement a program, where practicable, whereby students who wish to transfer are allowed to transfer to schools nearer their homes.

**6.** In addition, the Defendants filed a Motion to Dismiss on the same grounds—that the Plaintiffs lack standing to sue and that indeed Plaintiffs have failed to state a claim for money damages. Essentially, the Defendants argue that the individual Plaintiffs cannot show that they have suffered an "injury in fact." Importantly, they suggest, due to the recent plan modification removing race as a factor, the Plaintiffs cannot establish future invasion of their rights. Furthermore, three of the four Plaintiffs cannot show actual harm because they did not apply for assignment this school year; discouragement based on negative past experiences is not enough. Finally, the Defendants argue that the last Plaintiff, John O'Toole Jr., who did apply for assignment, was denied his choices because of his high random number, not because of race; thus he too cannot show actual injury on account of a race preferential plan.

## C. *The Plan*

The Controlled Choice Student Assignment Plan had its origins in the challenges to Boston's segregated public school system and the remedial court orders that followed. In 1974, the district court held that the City of Boston, through the Boston School Committee, was operating and maintaining a dual education system which segregated students by race, in violation of the U.S. Constitution. *See Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974), *aff'd, Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir.1974). To rectify these violations, the district court issued a number of orders focusing on, among other things, student assignments.[7]

After 1982, the district court found that the Boston schools had made progress towards the goal of "unitary status" in certain areas (i.e. that schools were no longer segregated by race) but not in the area of student assignment. *See Morgan v. Nucci*, 831 F.2d 313, 316 (1st Cir.1987) (describing the termination of judicial orders concerned with student transportation, bilingual education and special education). In 1985, the court issued "final orders" setting out binding requirements and standards. *See id.* The School Committee was required, for an indefinite period of time, to maintain specific racial mixes in the city's schools, much like those it had

been required to achieve during the prior years of court supervision. *See id.* at 317.

In 1987, after twelve years of court supervision, the First Circuit vacated the orders addressing the student assignment process on three grounds: "(a) BSC's proven commitment to [and good faith effort in] eliminating racial discrimination; (b) its success in dismantling virtually all the one-race schools the system had once maintained; and (c) its apparently desegregating the schools as much as possible given the realities of modern urban life." *McLaughlin v. Boston School Committee*, 938 F.Supp. 1001, 1005 (D.Mass. 1996) (discussing reasoning in *Nucci*, 831 F.2d at 319).[8] In conclusion, the court stated: "We have no reason to question the good faith of the present Boston School officials ... or to doubt that the return to local autonomy will do anything but preserve the gains the schools have made over the past 15 years." *Nucci*, 831 F.2d at 326 n. 19.

A permanent injunction remained in place, enjoining Defendants from creating, promoting, or maintaining racial segregation in any school or other facility in the Boston Public School System.

Soon after issuance of *Nucci*, Mayor Raymond Flynn hired two consultants to

The Defendants also challenge the standing of the organization to bring suit on behalf of itself or its members, that the organization cannot show "actual harm" in order to sue on its own behalf, and that because its members lack standing, it cannot sue on behalf of the members either.

For the purpose of this preliminary injunction, I find that at least Plaintiff O'Toole has standing to raise the claim, as I describe above. I will defer further consideration of the standing issue with respect to the remaining Plaintiffs and BCF, as well as the class certification question.

7. The court divided the city into eight geographical community districts and one city-wide "magnet district." *Morgan v. Kerrigan*, 401 F.Supp. 216, 256–57 (D.Mass.1975). It required that assignments to schools within any one of the community districts be such as

would ensure that the percentage of black, white, and "other minority" students approximate the corresponding percentage of each group in that district's total student population. *See id.* at 261.

At about the same time, the district court issued orders relating to faculty and staff, *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass. 1975), *aff'd*, 530 F.2d 431 (1st cir.1976); facilities, *see Morgan v. McDonough*, 689 F.2d 265 (1st Cir.1982); special education, school safety and security, student discipline, bilingual education, vocational education and student transportation, *see Morgan v. Nucci*, 620 F.Supp. 214, 218 (D.Mass.1985).

8. Although *Nucci* terminated the Court's jurisdiction in the area of student assignments, it affirmed the Court's continuing jurisdiction over faculty and staff desegregation. *See McLaughlin*, 938 F.Supp. at 1006.

develop a new student assignment plan. *See McLaughlin,* 938 F.Supp. at 1006. After several months of consultation and hearings, the Boston School Committee voted to approve the general framework of the consultants' plan—the Controlled Choice Assignment Plan in place today with some modifications. On February 27, 1989, it formally voted to adopt the Plan. While the vote authorized the School Department to undertake the necessary preparations for implementation of the Plan, it was, "subject to further modification pursuant to the procedures set forth in paragraph 8 of the final Orders in *Morgan v. O'Reilly; McLaughlin,* 938 F.Supp. at 1007 (citing BSC order)."

The stated goals of the Plan are to guarantee racial fairness, enhance education, and provide parents, and students with increased choice of schools.[9] Pursuant to the Plan, the City of Boston is divided into three zones, the East, North and West Zones. These zones are designed to reflect the system-wide proportion of students of different races at the K–8 level. Students may apply for assignment to any school within their residential zone.

For selection purposes, each student is assigned a random number which determines his or her ranking in a lottery for the available seats at each of the schools for which the student is eligible. Families then rank those schools as they choose. While the Plan does not guarantee students their first choice, families are encouraged to apply as early as permitted to improve their chances.

In making the final assignments, the following factors are considered: (1) the assignment of a sibling to the school; (2) walk-zone priority; (3) the ranking of the school by the student; (4) priority for students, assigned to temporary seats at a school to continue on at the same school; (5) whether seats are available for students of that race or ethnicity (within the ideal racial percentage plus or minus 15%); and (6) the student's random number. Additionally, minorities may be assigned to surplus seats at schools which would have otherwise been given to a child from another minority group; i.e., a black child can use an unused seat that had been calculated into the percentage of "other minorities."

Students who do not receive their first or second choice have the option of being placed on a waiting list for their preferred schools. It appears as though children on these waiting lists may be assigned without consideration of race, at least after June 30, as reflected in the most recent guide to the student assignment program.

How race comes into play in the final assignment is not entirely clear from the preliminary record before me. Was there an initial effort to assign all seats using ostensibly race-neutral factors,[10] with race used as a default rule if certain "ideal" percentages are not met? How frequently was the default rule invoked?[11] How flex-

---

**9.** The preamble (quoted in *McLaughlin,* 938 F.Supp. at 1006) states:

> A well-designed and implemented Controlled Choice Plan will work to eliminate all vestiges of unlawful segregation, prohibit future discriminatory assignment practices and will create a more equitable framework within which parents, students and educators can operate an educationally diverse and distinguished system of public schools.... Controlled Choice is constitutionally defensible and permissible student assignment strategies because it guarantees equitable school desegregation.

**10.** It should be noted that Plaintiffs challenge the use of sibling preference as a "neutral" factor, if the first family member was assigned to a school based on race. Presumably, under those circumstances, the subsequent sibling assignments would perpetuate that "racial" preference. The issue needs to be litigated—how was sibling preference weighted, to what degree did it reflect improper racial preferences?

**11.** The Defendants have maintained that only one Plaintiff applied for 1999 placement, John O'Toole, Jr., and he did not receive his choice because of his high lottery number, not his race. Indeed, they suggest that somehow dis-

ible were the percentages? Or, is it true, as the Plaintiffs contend, that no matter how the plan was "prettied up," were the white students effectively competing for a set percentage [15%] of the seats from the outset?

What is clear, however, is that the Plan as it is currently constituted will end with the 1999–2000 school year. Approximately three weeks after the filing of the Plaintiffs' complaint, on July 14, 1999, the Boston School Committee, upon the recommendation of Superintendent Payzant, voted 5–2 to modify the challenged assignment plan by removing race as a factor in determining school assignments starting with the school year of 2000–2001. While the exact contours of the modification are not yet determined, Defendant Payzant claims that he is committed to presenting a revised plan to the School Committee for discussion and approval by November 1999.[12]

### D. *The Timing of the Law Suit*

On January 11, 1999, the director of the BCF wrote a letter to the *Boston Globe,* criticizing the present Plan. The letter was written four days after the beginning of the First Application Period for the 1999–2000 school year, and about a month before John O'Toole Jr., the only Plaintiff requesting assignment for the 1999–2000 school year, submitted his application. On March 10, 1999, O'Toole's parents, were informed that his six choices for Kindergarten had been denied, leaving him unassigned and on a waiting list.[13]

In April 1999, discouraged by the organization's inability to bring about changes in the Plan through political pressure, the Director of the BCF found legal represen-

tation. It was not until June 21, 1999, however, that the BCF, joined by the four named Plaintiffs, filed the complaint, amended June 28, 1999. And it was not until July 2, 1999, that the complaint was served on the Defendants, followed by the Motion for Recusal, filed July 6, 1999, and the Memorandum in Support of Recusal on July 9, 1999. As of that date, no separate motion for a preliminary injunction had been filed with the affidavits required by the Rules.

On July 13, 1999, I scheduled a status conference to address scheduling and the pending Motion for Recusal. Finally, on the same day, now almost three weeks after the original complaint had been filed, the Plaintiffs filed the preliminary injunction motion, together with the supporting affidavits. A hearing was held on August 2, 1999.

### II. *LEGAL ANALYSIS*

A preliminary injunction is an extraordinary equitable remedy. It requires intervention by the Court on an emergency basis, without the usual careful procedures and litigation methods— the exchange of information in discovery, evidentiary hearings, the full and complete briefing of the issues. As such, the law imposes on Plaintiffs the substantial burden of convincing the Court that they are likely to succeed ultimately and further, that if emergency relief is not granted, they will be "irreparably" harmed. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2nd Cir.1996) (holding that a moving party must make a clear or substantial showing of a likelihood of success where an injunction will alter, rather than maintain,

tricts were drawn and targets set to minimize resort to the "default rule" and to maximize choice.

12.  The School Committee's order stated that the plan may include other changes necessary to maximize access to choice, to support diversity, and to promote quality education for the children of Boston.

13.  The School Department guarantees assignment to full-day Kindergarten only for five year old children ("K2"). While there is no guarantee of assignment to the school of choice, there are limited numbers of openings in "K0" and "K1" for children who are three and fours years of age. O'Toole is four years old.

the status quo); *Miller v. Board of Comm'rs. of Miller County*, 45 F.Supp.2d 1369, 1370 (M.D.Ga.1998); *Eisenberg v. Montgomery County Public Schools*, 19 F.Supp.2d 449, 451–52 (D.Md.1998) (Discussed *infra*. Section B.)

In this case, the Defendants raise an additional challenge—that preliminary relief is precluded by the doctrine of laches. Put simply, laches directs a court to bar the assertion of a claim where a party has "slumbered" on his or her rights to the detriment of the other side. It derives from a concern for procedural fairness, rather than for the merits of the claim— the impact of plaintiffs' delay in bringing a claim on the defendants' ability to litigate the issues or to provide or sustain a suitable remedy. Laches has special resonance in the context of a request for preliminary relief, when, in effect, the plaintiffs claim urgent action must be taken. While some of the factors involved in laches are related to the issues I have to address on the question of preliminary injunctive relief,[14] the Defendants raise questions that are logically prior to the merits claims.

### A. *Laches*

■ Laches "bars assertion of a claim where a party's delay in bringing a suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party" in defending the claims. *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure, Civil*, § 2946, at 113 (1995). When the timing is not controlled by a statutory limitation period, the burden rests with the defendant to establish

both unreasonable delay and substantial prejudice. *See K–Mart*, 875 F.2d at 911.

Plaintiffs waited until June 21, 1999, to bring this suit.[15] And even when they finally brought the action, they delayed serving the defendants (July 2, 1999) and in preparing and serving the injunction papers (July 13, 1999.)[16]

Defendants claim that there is no justification for the delay, and that they are prejudiced by it. It is unfair, they say, to the children, the staff and the parents, to disrupt school assignments at the very last moment. I have one additional concern— the fairness of forcing the litigation of complex and significant issues on a truncated, hastily assembled, record.

Plaintiffs answer, in effect, that they did the best they could. The disruption, they suggest, is minimal. The law is clear, and flows directly from a prior decision of the First Circuit, *Wessmann*, 160 F.3d 790 (1st Cir.1998). In any event, the case involves constitutional injuries of such magnitude that administrative inconvenience cannot stand in the way of their redress.

### 1. *Unreasonable Delay*

■ The question of when delay becomes unreasonable is not simply a question of time but of context, the nature of the underlying claim, the opportunity to bring it earlier, the reasons for the delay. *See Kay v. Austin*, 621 F.2d 809 (6th Cir. 1980); *Miller*, 45 F.Supp.2d at 1373.

The Plaintiffs had many opportunities to bring the suit earlier. One of the Plaintiffs, Kathleen McCoy, claims she was denied a slot in her school of choice because of her race a full three years ago. Two other Plaintiffs, Michael Gattozzi, the son

---

14. In this case, the Defendants have the burden of proving prejudice for the purpose of laches, and the Plaintiffs have the burden of proving irreparable harm for the purpose of a preliminary injunction. In fact, the two concepts are related and will be discussed in tandem. In deference to the gravity of the issues, however, I put the ultimate burden on the Defendants.

15. The Plaintiffs subsequently filed an amended complaint on June 28, 1999.

16. There were approximately nine weeks between the date when the preliminary injunction motion was filed, and the first day of school—September 9, 1999. There will only be approximately five weeks left after the issuance of this decision.

of one of the founders of BCF and Nicholas Anderson, both claim to have been affected by racial considerations more than a year ago. And even the plaintiff with the most recent cause to complain, John O'Toole Jr., was notified that he did not receive a Kindergarten space in March, 1999.

BCF, the initiating plaintiff, has been in existence since the summer of 1997. In July 1997, it had enough information about the Boston School assignment plan to submit a petition to the City Council for a non-binding referendum on return to neighborhood schools. Although I applaud the efforts of BCF to address this issue through the political process, it does not excuse its lack of diligence in taking legal action, or even notifying the potential Defendants of its intent to do so, once it became clear that the political process was unsuccessful.

Notwithstanding the pre-existing claims of Gattozzi, Anderson, and McCoy, and the lobbying of BCF, Plaintiffs claim that they could not move earlier because they did not find counsel until March or April of 1999. And Plaintiffs' counsel claimed at oral argument that he could not bring the case any earlier because he is a First Amendment specialist and needed time to research the claim, and perform his obligations under Fed.R.Civ.P. 11.[17] In addition, he was involved in a significant and difficult criminal trial in June which prevented his giving this case his full attention.

The First Circuit decision in *Wessmann*, on which Plaintiffs rely, was decided November 19, 1998. (Indeed, Plaintiffs' counsel plainly was familiar enough with the issues as of that date; he is listed as the author of an *amicus* brief in the *Wessmann* case, on behalf of Citizens for the Preservation of Constitutional Rights.) While I appreciate the need to research the issues, and the impact of other important work, these reasons do not justify this delay.

Defendants point to the fact that the June 21 date is the anniversary of the decision in the original school case.[18] Counsel for the Plaintiffs denies any relationship. As I noted at oral argument, if that were indeed the motivation for the timing of the action, it would make good politics, but bad law. Neither the delay in bringing this action, nor the leisurely pace at which is has been litigated is justified.[19]

---

**17.** Rule 11 imposes a burden on the person signing, filing or later advocating a pleading, to certify that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase to the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery...." Fed. R.Civ.P. 11.

**18.** On June 21, 1974, the District Court of Massachusetts held in *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974), that the Boston School authorities intentionally brought about and maintained a dual school system.

**19.** Even when the issues were as momentous as they are here, and important constitutional claims hung in the balance, courts have been concerned about the timing of the litigation. For example, in several cases which dealt with elections, courts sought to balance the need for prompt action by plaintiffs against the potential disruption of a large state-sponsored event. The Seventh Circuit, in *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990), noted that "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. The candidate's and party's claims to be respectively a serious candidate and a serious party with a serious injury become less credible by their having slept on their rights." *See also Williams v. Rhodes*, 393 U.S. 23, 34–35, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (denying the Socialist Labor Party's request to be included on the Ohio ballot because of its delay in

## 2. *Prejudice*

I am concerned about the prejudice to the Defendants occasioned by the timing of the lawsuit on two fronts—on the Defendants' and the Court's ability to carefully address the issues, and on the potential disruption to the school system caused by the requested emergency relief.

Plaintiffs contend that there are no unresolved legal issues, that the First Circuit's decision in *Wessmann* decided the matter entirely. The School Committee, after all, has admitted a constitutional violation.[20] In the context of the enormity of the claimed constitutional violation, any disruption is minimal. Since these issues are identical to the issues I must address in order to resolve the preliminary injunction request, I will address them more fully in the preliminary injunction section. Discussed *infra*, at Section B.

Suffice it to say, at this point, that the Plaintiffs have chosen to mount a very broad challenge to the use of race *in any way* in school assignment, far broader than the claims in *Wessmann*. Significantly, the School Committee gave itself four months to redraft the assignment plan so that it would conform with their constitutional obligations to all concerned—not four weeks. And if past litigation on this issue is the model, the issues are likely to be highly charged and difficult. When the Plaintiffs in *Morgan* brought the first challenge to Boston's segregated schools, for example, the complaint was filed March 15, 1972, and six months before school started. Relief was ordered two years later.

Likewise, the Plaintiffs seek an injunction that reaches far beyond that sought in *Wessmann*. While *Wessmann* had implications for other students, preliminary relief was requested only on behalf of a single one. As I describe in greater detail in Section B., in contrast, the relief here impacts the lives of families all over the city who have received assignments—whether their first choice or not—who have met with teachers, coordinated after school care, etc. It impacts teachers and principals who at this late date in the summer have already established their rosters, met with parents, and began to plan for the upcoming year.[21]

Not even the facts in this case are clear; the parties have differed on how the Plan operates and how it has affected the Plaintiffs. *See Miller*, 45 F.Supp.2d at 1373 (finding that the plaintiffs' waiting until two weeks before election was especially unreasonable "considering that the evidence proffered thus far in support of their motion mainly consists of one expert's analysis of the resident and voting populations of the County's electoral districts.") In short, to the extent that this case turns on difficult issues of fact and law, and threatens major disruption to Boston school children, Defendants are prejudiced.

seeking relief, the disruption it would impose on the election process, and the possible interference with the rights of Ohio voters that would attend such a last minute change); *Kay v. Austin*, 621 F.2d 809, 813, (6th Cir.1980) 621 F.2d at 813 (applying laches where a candidate filed suit over three weeks after he knew his name would not be on the ballot, during which time the state proceeded with election preparations); *McCarthy v. Briscoe*, 539 F.2d 1353, 1354–55 (5th Cir.1976) (denying application for emergency injunctive relief where the entire election process would be disrupted by a lawsuit filed on July 30, seeking ballot access to the November presidential election.)

**20.** As means to introduce their *Memorandum of Law in Support of Plaintiffs' Application for A Preliminary Injunction*, the plaintiffs quote Superintendent Thomas W. Payzant: "I don't think it's responsible to go forward with a law suit that we're likely to lose."

**21.** In *McLaughlin*, the court initially denied preliminary relief in part because of the numbers of students similarly situated to the plaintiff, and the timing of the proposed order within days of the start of the school year. In contrast, the following year, when the court granted relief, the number of similarly situated students was considerably lower. *McLaughlin*, 938 F.Supp. at 1012.

I hasten to add that finding for the Defendants on the basis of laches does not end this case. It has no bearing on Plaintiffs' motion for a permanent injunction or for declaratory relief.[22] Rather it reflects this Court's deep concern for the issues raised and their potential significance. Too much is at stake here to rush to judgment.

### B. *Preliminary Injunctive Relief*

█ In order to obtain a preliminary injunction, the Plaintiffs have the burden of satisfying four elements: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., 'the hardship of the non movant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld'; and (4) the effect on the public interest of a grant or denial of the injunction." *Gately v. Comm. of Mass.*, 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied*, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994); (*quoting Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991)). In balancing these elements, the Plaintiffs are entitled to relief if "the harm caused plaintiffs without the injunction, in light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants." *United Steelworkers of America AFL—CIO v. Textron, Inc.*,

836 F.2d 6, 7 (1st Cir.1987) (*quoting Vargas–Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir.1987)). While the four requirements are generally considered together, the threshold inquiry in this Circuit is on the requirement of success on the merits. *See Lancor v. Lebanon Housing Authority*, 760 F.2d 361, 362 (1st Cir. 1985).

### 1. *Likelihood of Success on the Merits*

█ The first question which must be addressed is whether Plaintiffs have standing to raise these claims. If, as Defendants suggest, they do not, the case is at an end. While I have deferred that final decision for later briefing, I find here that at least one Plaintiff, young O'Toole, has standing based on the claims alleged. O'Toole applied for a K1 seat for the 1999–2000 school year, and did not get one. While the Defendants claimed that that result derived from his high lottery number, not his race, the argument is not adequate given the breadth of O'Toole's challenge. O'Toole challenges the very division of the City of Boston into three zones for the purpose of maximizing diversity; the district in which he resided plainly affected the seats available, and the choices he could reasonably make. In addition, he alleges that however complex the selection process, his race undermined his ability to compete on an equal footing for the limited K1 seats.[23] Whether that is in

---

**22.** In *Miller*, 45 F.Supp.2d at 1373–74 (M.D.Ga.1998), the plaintiffs sought a declaratory judgment and permanent injunction, claiming that the county's electoral systems denied the plaintiffs the right to vote on account of their race. *See id.* at 1370. The plaintiffs brought the suit on April 22, 1998, and agreed to extend time for defendants to reply until June 18, 1998—"approximately four weeks prior to the scheduled primary elections." *Id.* at 1374. Then, on July 7, 1998, with only about two weeks to go before the elections, the plaintiffs moved for a preliminary injunction. The court reasoned that the plaintiffs were not barred by laches from seeking "permanent injunctive relief insofar as the electoral system in dispute has produced a recent injury or presents an ongoing injury to the voters." *Id.* at 1373. But it

distinguished that ongoing concern from the plaintiffs' eleventh hour attempt to block an election.

**23.** The Supreme Court has held that:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.... And in the context of a challenge to

fact true, and further whether that is in fact unconstitutional is an issue for the merits; for the purpose of standing to raise these preliminary claims, it is sufficient to have alleged a cognizable injury.

■ The second, more fundamental question is whether the law is as clearly in their favor as the Plaintiffs suggest. To the extent there is any clarity in this area, it concerns the standards to be applied. Whenever a challenged policy involves a consideration of race, "the policy must be justified by a compelling governmental interest and be narrowly tailored to serve that interest in order to stand." *Wessmann*, 160 F.3d at 793. *See also The Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). According to Plaintiffs, the only conceivable basis for the Plan, diversity, can never be a compelling government interest justifying the consideration of race.

But *Wessmann* does not go so far. The First Circuit was explicit: "[W]hat interests government may legitimately invoke to justify race-based classification is largely unsettled." 160 F.3d at 795.[24] *See also Wittmer v. Peters*, 87 F.3d, 916, 918 (7th Cir.1996).

This is especially true in an educational setting. Although in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) Justice Powell rejected the idea of considering specific percentages for particular groups merely based on race or ethnic origin, his decision suggests that the goal of "genuine diversity" in an educational setting is a compelling government interest.[25] *See Bakke*, 438 U.S. at 311–15, 98 S.Ct. 2733 ("the attainment of a diverse student body ... [is] clearly a constitutionally permissible goal for an institution of education.") And he adds, "it is not too much to say that the nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples." *Id.* at 312, 98 S.Ct. 2733.

While one appellate court in *Hopwood v. State of Tex.*, 78 F.3d 932 (5th Cir.1996) was willing to declare Justice Powell's opinion dead,[26] the First Circuit would not: "[W]e are not prepared to make such a declaration in the absence of a clear signal that we should.... This seems especially prudent because the court and various individual Justices from time to time have written approvingly of ethnic diversity in

---

a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract.
*Northeastern Florida Ch. Assoc. Gen. Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

24. On the one hand, the "role model" theory has been rejected. On the other hand, race-based classifications entered to undo the legacy of that institutions' past discrimination have been accepted. But it is not at all clear what other justifications will pass muster, as the court noted: "[I]n certain milieus, some courts have accepted race based taxonomies that are not linked to remedying past discrimination, particular in settings such as law enforcement and correction." *Id.* at 795.

25. In *Bakke*, a highly fragmented Court struck down an admissions program at the medical school at the University of California at Davis that evaluated minority applicants separately

from other applicants, and set aside a prescribed number of seats for minorities.

26. In *Hopwood* the Fifth Circuit rejected diversity as a compelling interest in law school admissions. *See* 78 F.3d at 948. *See also, Lesage v. State of Tex.*, 158 F.3d 213 (5th Cir.1998) (following *Hopwood* in rejecting diversity as compelling state interest in graduate school admissions); *Lutheran Church—Missouri Synod v. F.C.C.*, 141 F.3d 344, 354 (D.C.Cir.1998) (rejecting diverse programming as compelling interest to support FCC hiring regulations for radio stations); *Taxman v. Board of Edu. of Tp. of Piscataway*, 91 F.3d 1547 (3rd Cir.1996) (finding a non-remedial affirmative action plan violated Title VII since it was adopted to promote racial diversity in hiring rather than remedy past discrimination). *Tito v. Arlington County School Board*, 1997 U.S. Dist. LEXIS 7932 (finds not compelling interest in diversity on this case).

comparable settings." [27]

The answer is, as the First Circuit said, entirely context specific: Citing *Gomillion v. Lightfoot,* 364 U.S. 339, 343–44, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the court noted that "it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts." *Wessmann,* 160 F.3d at 796.

Assuming that diversity can be a compelling interest, *see Wessmann, supra,* determining whether the Plan at issue is narrowly tailored to accomplish it pivots not merely on the fact that race is used in a school plan, but how it is used, in what settings, for what purposes, whether it is race conscious or race preferential, whether it involves an examination school (or a college or law school) for which there are significant qualifications, or an elementary school, for which there are not, whether the use of race excludes entirely or simply affects the distribution of a benefit, whether it is flexible, etc.[28] The record before me—both the facts and the law does not allow me to make these critical findings.

The context of this case is significantly different from that considered in *Wessmann.* First, the breadth of the Plaintiffs' challenge is different—not just race preference but also race conscious remedies; not just the use of race in making the ultimate assignments, but the use of race in drawing up school districts. Plaintiffs call for the elimination of race in the as-

signment process and its total expungement from the School Committee's computers. However much the law has changed over the past several years—whatever new consensus may be emerging—it is not at all clear that it goes as far as the Plaintiffs urge.

Second, this case involves elementary schools for which there are no qualifications other than residency.[29] Diversity may well be more important at this stage than at any other—Kindergarten is when first friendships are formed and important attitudes shaped—without any countervailing concerns about merit. *Wessmann* involved an examination secondary school, *Hopwood* a law school, *Lesage* a graduate school, *Bakke* a medical school. In *Eisenberg,* 19 F.Supp.2d 449, for example, the court noted:

> It is obviously unlikely that first graders will have extensive resumes which may be weighed and considered in addition to their race in the District's formulation of how to craft diverse classrooms. Notwithstanding the lack of classroom experience and other distinguishing credentials of these students, however, the need for a diverse classroom is equal, if not greater, than in later years. Where children first begin to forge social relationships and interactions with their peers, in the view of the Court, the need for diversity is at its greatest.

19 F.Supp.2d at 454.

Third, the way the Plan actually operates is likewise important—whether it in-

---

**27.** Likewise, other district courts have decided that until the Supreme Court actually speaks to this matter, "diversity" survives as a compelling state interest. *See e.g. McLaughlin,* 938 F.Supp. at 1014–15; *Brewer v. West Irondequoit Central School Dist.,* 32 F.Supp.2d 619, 631 (W.D.N.Y.1999); *Eisenberg v. Montgomery County Public Schools,* 19 F.Supp.2d 449, 453 (D.Md.1998).

In addition to diversity, at least two other concerns have been advanced as compelling: equal educational opportunities and the duty to improve public school education. *See e.g. Martin v. School Dist. Of Philadelphia,* 1995 WL 564344 at *2 (E.D.Pa.) ("And there can be little doubt that the state's interest in ensuring

equal educational opportunities across race lines is a compelling one."); *Hunter v. Regents of Univ. of Cal.,* 971 F.Supp. 1316, 1327 (compelling interest in research relevant to improvement of state's public schools).

**28.** The Court noted that "[t]he word 'diversity' . . . does not admit of permanent concrete definition. Its meaning depends not only on time and place, but also upon the person uttering it." *Wessmann,* 160 F.3d at 796.

**29.** *See generally* Note, "The Constitutionality of Race–Conscious Admissions Programs in Public Elementary and Secondary Schools," 112 Harv.L.Rev. 940 (February, 1999).

volves total exclusion of a given class or an alternative assignment,[30] whether it involves flexible standards or wholly disqualifying factors, whether it is indefinite for a fixed period, or whether it is subject to periodic review, whether less preferential alternatives are feasible. *See McLaughlin,* 938 F.Supp. at 1015. At issue here is the second component of the strict scrutiny ·inquiry—whether the challenged Plan is "narrowly tailored" to advance any compelling interests defendants may establish.

**30.** As Justice Powell noted:
> Respondent's position is wholly dissimilar to that of a pupil bused from his neighborhood school to a comparable school in another neighborhood ... Petitioner did not arrange for respondent to attend a different medical school in order to desegregate Davis Medical School; instead it denied him altogether of a medical education.

*Bakke,* 438 U.S. at 300 n. 39, 98 S.Ct. 2733.

**31.** Another ground on which Plaintiffs argue they deserve relief is Title VI of the Civil Rights Act of 1964 ("Title VI"), which reads: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Plaintiffs properly allege that the Boston Public Schools are covered under Title VI because they receive federal financial assistance. *See Wooden v. Bd. of Regents of the University System of Georgia,* 32 F.Supp.2d 1370, 1379 (S.D.Ga.1999) (to state a claim under Title VI, a plaintiff must allege that the defendant is "(1) receiving federal funds; and (2) engaging in racial discrimination."). They point out that the proper framework to apply is a burden shifting framework as would apply under Title VII (42 U.S.C. § 2000e). *See Young By and Through Young v. Montgomery County,* 922 F.Supp. 544, 549 (M.D.Ala.1996) (Holding that "Title VI disparate impact claims under 34 C.F.R. 100.3(b)(2) derive from cases decided under Title VII."); *Davis v. Halpern,* 768 F.Supp. 968, 974 (E.D.N.Y.1991) (describing a burden shifting framework for Title VI reverse discrimination cases). Finally, they argue that while they can easily make a prima facie case of discrimination under the Plan, the defendants cannot articulate a legitimate nondiscriminatory purpose for the race-based features of the Plan.

The problem with plaintiffs' argument is the same as that described above. I cannot determine whether the defendants could articulate a legitimate nondiscriminatory purpose until the facts are collected and the arguments briefed more fully. For a race conscious plan may be perfectly legitimate under the regulations which govern the application of Title VI to programs receiving federal funding through the Department of Education: "Even in the absence of ... prior discrimination [by the program in question], a recipient [of federal funds] in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." 34 C.F.R. 100.3(b)(6)(ii). *See also Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (holding that "Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts.").

*See United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).

At this point, the challenged Plan *is* of limited duration; it will not last beyond the 1999–2000 school year. And it has been subject to periodic review, thanks to the continuing efforts of the BCF.

In short, I cannot, on this truncated record, conclude that either side is likely to succeed on the merits.[31]

In any case, the Plan will have to pass muster under a strict constitutional analysis which raises precisely the issues addressed above.

Plaintiffs further argue that the defendants' use of racial categories in school assignment is in conflict with Mass. Const.Amend.Art. 111, which reads: "No Student shall be Assigned to or denied admittance to a public school on the basis of race, color, national origin or creed." No court has yet considered this Amendment in any way, not even *Wessmann* and *McLaughlin* for which it seems directly on point. While this Amendment facially shores up the merits of the plaintiffs' case, there was no briefing on the possibility of preemption or its proper interpretation. And at this late date, I will not .appeal to untested state law to fill in any possible gaps in the merits of the plaintiffs' federal case.

## C. *Balance of Potential Harms*

As with laches, a preliminary injunction involves a balance of harms, only here, the burden rests with the plaintiffs. The plaintiffs must establish that they will suffer irreparable harm as a result of obtaining no preliminary relief, and that this harm outweighs any burden that might otherwise affect the defendants if the relief were granted. *See McLaughlin,* 938 F.Supp. at 1011.

The plaintiffs argue that the alleged violation of their Equal Protection rights under Fourteenth Amendment constitutes that irreparable harm. *See id.* (plaintiff argues that constitutional violation constitutes irreparable harm); *see also Planned Parenthood,* 641 F.2d at 1022–23 (stating that if a policy is "probably unconstitutional [that] necessarily entails a decision as to the other preliminary injunction criteria as well"). This argument rises and falls with my determination of the likelihood of success on the merits of the constitutional claims. Given what I have found above, this showing—in and of itself—is not sufficient.

In addition, the plaintiffs argue that irreparable harm occurs when a child, like John O'Toole Jr., is denied the opportunity "of ever" attending kindergarten. Not only could this negatively impact a child's academic future, the plaintiffs argue, but even if and when he is assigned to a class, he will have been deprived the stability and continuity of being in the same school, with the same classmates, for all the years of school.

It is indeed troubling that children like O'Toole may not attend K1 this year. Even though he will be eligible for a guaranteed seat in K2 next year when he reaches age 5, there are clearly benefits to being enrolled in school at as early an age as possible.

Defendants counter (1) O'Toole was not denied K1 because of race; (2) he cannot seek emergency relief because he has sat on his rights; (3) the balance of harms here weighs dramatically in their favor. The latter is especially important.

The relief requested will impact the settled expectations of families all over the city who have received assignments—whether their first choice or not. Before making school selections for the 1999–2000 school year, parents, as early as January, 1999, began researching schools, collecting literature, going to School Showcase exhibitions, participating in school open-houses, and speaking with principals, teachers, and other parents. Once assignments were made, whether for first or other ranked choices, parents attended a second round of open house meetings, introduced themselves, and more importantly, their children, to principals, teachers, and the physical plant of the school. Pre- and post-school arrangements were made, special education and language programs were selected, transportation has been organized. Families are ready for the school year to begin.

In addition to the parents and children, the relief impacts teachers and principals who, at this late date have established their rosters, met with parents and children, helped arrange special childcare arrangements.

The plaintiffs claim that "only" 934 of children would need to be reassigned if race was immediately eliminated as a factor for assignment. In contrast, the defendants present a far greater and probably conservative number, between 15,000 and 20,000 students. Even though having to reassign 934 children is enough to establish a weighty burden on the defendants, I have heard enough to suggest that the defendants' estimates are probably closer to the truth. *All* participants have relied on one selection mechanism; if that mechanism is altered, fairness requires that they all have an opportunity to try again.

## D. *Public Interest*

The final criterion of the preliminary injunction is whether the issuance of the

injunction sought by a plaintiff would have such and adverse effect upon the "public interest" that even if the other three factors weigh in favor of relief, the injunction should not be issued. *See McLaughlin,* 938 F.Supp. at 1017.

It is clear that the burden of implementing this requested relief would be felt enormously by the public. Plaintiffs argue that the public has a great interest in remedying constitutional violations. True. But where I cannot conclude that there is a likelihood of success on the merits and where the burden of reassigning thousands of children and the possibility that the beginning of school could be delayed is so onerous, emergency relief cannot be justified.[32]

## III. *CONCLUSION*

Preliminary relief is entirely inappropriate in this case at this time. The issues are complex and need to be litigated carefully. The potential disruption should preliminary relief be granted is substantial.

The following briefing schedule is designed to effect a careful consideration of the issues. A hearing on the Defendants' Motion To Dismiss is scheduled for September 28, 1999, at 3:30 PM. Should the parties wish to file any additional pleadings they are to do so by September 21, 1999.

The Plaintiffs' Motion for Class Certification is to be argued on the same day as the *Motion To Dismiss,* September 28, 1999, at 3:30 PM. Likewise, if the parties wish to file additional material, they are to do so by September 21, 1999.

**SO ORDERED.**

---

**32.** Defendants argue further that as to prospective injunctive relief, the case is moot. The School Committee has announced hat it would remove considerations of race as a factor from school assignments. Plaintiffs argue, correctly, that they cannot rely on that announcement alone. There is no plan now; none will be issued for four months. And given the scope of their challenge, there is no guarantee that their objections will be met.