**Jeffrey EISENBERG, et al., Plaintiffs,**

v.

**MONTGOMERY COUNTY PUBLIC SCHOOLS, et al., Defendants.**

**No. CIV.A. AW 98–2797.**

United States District Court, D. Maryland, Southern Division.

Sept. 4, 1998.

---

Jeffrey Eisenberg, Elinor Merberg, Silver Spring, MD, pro se.

Patricia A. Brannan, Maree Sneed, Rose Marie L. Audette, Hogan & Hartson, L.L.P., Washington DC, Judith S. Bresler, Reese & Carney, Columbia, MD, for Defendants.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Presently before the Court is Plaintiff's Motion for Preliminary Injunction. The Court, having considered the motion, the opposition thereto, the arguments of counsel at a hearing in open court, and the entire record, finds that the motion must be denied.

### Facts

Plaintiffs Jeffrey Eisenberg and Elinor Merberg bring the present action on behalf of their minor son, Jacob Eisenberg. Jacob is presently in the first grade. Based upon the residence of the family, Jacob is scheduled to attend Glen Haven Elementary School in Montgomery County, Maryland.

The Montgomery County Public Schools ("the District") administers a number of magnet programs in various schools, for among other purposes, to achieve racial diversity in the public schools of the county. The magnet programs offer enriched curricula. The District has established a math and science magnet program at Rosemary Hills elementary school. The District serves over 125,000 children enrolled at over 183 schools.

The District permits voluntary transfers among its schools. It publishes a transfer booklet which sets forth its policies with regard to transfer approval. Five factors are considered: school stability, utilization/enrollment, diversity profile, and the reason for the request. For the 1998–99 academic year, the District received 3,500 applications for transfer. The majority were granted. Approximately 570 appeals were filed of denials.

On March 30, 1998, the Eisenbergs submitted a request for transfer within the school district to Rosemary Hills Elementary School. The stated reason for the transfer request was that at Rosemary Hills, "we believe the school environment and curriculum offer [Jacob] the best opportunity for realizing his personal and academic potential." On the form, Jacob was identified as a white student.

On May 15, 1998, the transfer was denied. The only reason provided for the denial was "impact on diversity." A timely appeal was filed on May 28, 1998. Jacob's kindergarten teacher wrote a letter in support of the transfer appeal. A letter of denial was issued on August 6, 1998. Eisenberg next appealed to the Board of Education. This subsequent appeal was also denied.

According to the District, Glen Haven is overutilized and/or enrolled. Based upon the "diversity profile," white students are listed under the category: "No transfers out, transfers in permitted (unless overutilized)." The racial makeup for Glen Haven is 24.1% white, 40.5% African–American, 25% Hispanic and 10.1% Asian, compared to a countywide enrollment of 53.4% white, 20.3% African–American, 13.2% Hispanic and 12.7% Asian. The white enrollment at Glen Haven dropped from 38.9% in 1994–95 to 24.1 in 1997–98. In anticipation of the 1998–99 school year, 19 white students applied for transfer from Glen Haven. Of these students, 5 transfers were approved on personal hardship grounds, and 4 because siblings were already attending the requested school.

Montgomery County has never been under court order to desegregate its schools.

Mr. Eisenberg, acting pro se, now brings the instant action on behalf of his son seeking declaratory and injunctive relief, as well as damages, under 42 U.S.C. § 1983, for claimed violations of his constitutional rights, and under 42 U.S.C. § 2000d. Now before the Court is Eisenberg's motion for preliminary injunction, seeking to order the District to admit Jacob to Rosemary Hills.

### Discussion

A preliminary injunction is an extraordinary remedy that only should be is-

sued when the Plaintiff clearly establishes its entitlement to such relief. *See Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir.1997). The standards for injunctive relief in the Fourth Circuit are well known. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manuf. Co., Inc.,* 550 F.2d 189 (4th Cir.1977), the Fourth Circuit explained that the most important factors a district court must consider in deciding whether to grant injunctive relief are the threat of irreparable harm to the plaintiff should the Court not issue an injunction, and the likely harm to the defendant if an injunction is ordered. *See id.* at 196. The district court's first task is to balance these two factors. *See Manning,* 119 F.3d at 263. After doing this balancing, the court may then consider the third factor, which is the plaintiff's likelihood of success. *See id.* As the balance of harm moves in favor the defendant, the plaintiff has a greater burden in showing its likelihood of success. *See id.* Finally, the Court considers the fourth factor, the public interest. *See id.*

## A. BALANCING OF HARDSHIPS

■ Eisenberg claims a violation of his son's constitutional rights. He maintains that, if proven, his injuries constitute per-se irreparable harm. Eisenberg is correct. *See Johnson v. Bergland,* 586 F.2d 993, 995 (4th Cir.1978); *Henry v. Greenville Airport Comm'n,* 284 F.2d 631, 632–633 (4th Cir. 1960). The irreparable harm must nonetheless be balanced against the harm to the District. *See Johnson,* 586 F.2d at 995. In this case, the irreparable harm to Eisenberg is slight. He is not being denied access to education—the evidence is that he can receive a very comparable education at Glen View. Moreover, there is substantial potential harm to the District. Given the similarity between Eisenberg's transfer request and the requests of many other students that were denied, the District would likely be unable to deny transfers to any other student should Eisenberg obtain the relief he seeks. As explained later in this Opinion, the possibility that the transfer policy will lead to racial isolation among certain schools in the District is appropriately of paramount concern to the District, and the inability to prevent this occurrence obviously imposes a hardship. On balance, it appears to the Court that the balance of hardships slightly favors the District. Accordingly, Eisenberg must make a strong showing of a likelihood of success to prevail.

## B. LIKELIHOOD OF SUCCESS ON THE MERITS

The Court cannot conclude, however, that the instant action has a strong likelihood of success on the merits. The question presented is as follows: can the District can take race into account in deciding whether to approve voluntary transfer requests within Montgomery County?

■ Because "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination," *Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), when government actors take race into account in their decision-making, such racially conscious decisions are subject to exacting scrutiny by the courts. A challenged policy or decision can survive such "strict scrutiny" review only if it is justified by a "compelling governmental interest" and is "narrowly tailored" to accomplish that goal. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion).

The District has advanced two interests which it maintains are sufficiently compelling to justify their policy: avoiding the creation, through District action, of segregative enrollment patterns that might themselves constitute violations of the law, and the promotion of a diverse student population.

The Court will first address the second stated interest. Eisenberg maintains that the diversity interest, standing alone, is not a "compelling governmental interest"—he argues that the only interest sufficient to justify efforts to maintain racial diversity is a history of prior discrimination, which has not been alleged by the District. Citing to *Croson,* Eisenberg contends that "defendants must demonstrate that its own 'prior discrimination' justifies implementation of the diversity plan." But in *Croson,* the defendants did not rely upon an interest in diversity to

justify the affirmative action plan there considered. *See Croson,* 488 U.S. at 477, 109 S.Ct. 706 ("The plan declared that it was 'remedial' in nature, and enacted 'for the purpose of promoting wider participation by minority business enterprises in the construction of public projects' "). Likewise, the decision of the Fourth Circuit in *Podberesky v. Kirwan,* 38 F.3d 147 (4th Cir.1994), which Eisenberg also cites for the proposition that a remedial purpose is the only legitimate purpose which may justify the District's actions, never decided the question of whether diversity is a sufficiently compelling interest. *See Podberesky v. Kirwan,* 956 F.2d 52, 56, fn. 4 (4th Cir.1992) (opinion before remand) ("[t]he district court did not cite the need for diversity for this program, and it does not appear that UMCP established that the Banneker Program was established with this goal in mind"); *see also, Alexander v. Estepp,* 95 F.3d 312, 316 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1425, 137 L.Ed.2d 535 (1997) (striking down affirmative action program relying upon diversity as well as remedial interests, concluding that "even assuming, arguendo, that the asserted interests are compelling, the program is not narrowly tailored"); *Maryland Troopers Ass'n v. Evans,* 993 F.2d 1072, 1075 (4th Cir.1993) (reviewing district court finding that "[statistical] evidence of racial discrimination offered by the [defendants] was sufficient to warrant a race-conscious remedy"); *Hayes v. North State Law Enforcement Officers Association,* 10 F.3d 207, 213 (4th Cir.1993)(declining to decide whether diversity remains a sufficiently "compelling" rationale).

■ The Court believes that the diversity interest remains a compelling governmental interest in the context now being considered. In *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), a case where the High Court passed upon an affirmative action program at a state-sponsored medical school, Justice Powell wrote that "the attainment of a diverse student body ... [is] clearly a constitutionally permissible goal for an institution of higher education." *Id.* at 311–312, 98 S.Ct. 2733. This was so for many reasons, including the fact that "[a] great deal of learning occurs informally ... through inter-

actions among students of both sexes; of different races, religions and backgrounds ...." *Id.* at 312, fn. 48, 98 S.Ct. 2733. The importance of a diverse learning environment is at least as important in the context of public grade-school education. "Public secondary schools are of singular importance in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests." *Wessmann by Wessman v. Boston School Committee,* 996 F.Supp. 120, 128 (D.Mass. 1998) (quotation omitted).

While Eisenberg points out that Justice Powell did not enjoy the support of any other Justice with respect to his view in *Bakke* that diversity is a sufficiently compelling interest, it should be noted that this view has not been ignored by the other members of the court. *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 286, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (O'Connor, J., conc.) ("a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest"); *Id.* at 306, 106 S.Ct. 1842 (Marshall, J., joined by Brennan and Blackman, JJ., dissenting) ("the state purpose of preserving the integrity of a valid hiring policy—which ... sought to achieve diversity ... for the benefit of *all* students—was sufficient, in this case, to satisfy the demands of the Constitution"); *Id.* at (Stevens, J., dissenting) ("[i]n the context of public education, it is quite obvious that a school board may reasonably conclude that an integrated faculty will be able to provide benefits to the student body that could not be provided by a [non-diverse] faculty"). The Court deems the authority more than sufficient to conclude that diversity may be a compelling governmental interest

Although Eisenberg does cite authority for the proposition that diversity is not a sufficiently compelling governmental interest, *Hopwood v. Texas,* 78 F.3d 932 (5th.Cir.), *reh'g en banc denied,* 84 F.3d 720 (5th Cir.), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2580, 135 L.Ed.2d 1094 (1996); *Tito v. Arlington County,* Civ. Action No. 97–540 A (E.D.Va. 1997), the Court must respectfully disagree

with the conclusion reached by those courts. *See Wessmann,* 996 F.Supp. at 130 (describing the criticism of *Hopwood* decision).

■ The District also cites its interest in avoiding the creation, through its own action, of segregative enrollment patterns that might themselves constitute violations of the law. This interest is clearly sufficiently compelling to justify the questioned policy. The District is not required to permit transfers among schools within its district. In allowing the transfers, the District must of course do so without facilitating through its actions private conduct that leads to a discriminatory environment.

The Supreme Court expressed as much in examining a similar circumstance in *Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854. In *Croson,* a case dealing with the implementation of an affirmative action program for minority contractors, the Supreme Court discussed the effect of extremely low minority membership in local contractors associations as demonstrating discrimination in the industry. "If the statistical disparity between eligible [minority contractors] and [minority contractor] membership were great enough, an inference of discriminatory exclusion could arise. In such a case, the city would have a compelling interest in preventing its tax dollars from assisting these organizations in maintaining a racially segregated construction market." *Id.* at 503, 109 S.Ct. 706.

Likewise, extremely low percentages of minorities, or non-minorities, in certain public schools might raise an inference of discrimination. *See Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The District obviously has a compelling interest in not facilitating a discriminatory environment though state action. *See Norwood v. Harrison,* 413 U.S. 455, 465, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) ("[i]t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish").

■ The question remains whether the policy was narrowly tailored. The District persuasively argues that the program is nar-

rowly tailored to further their interests. The District notes that its policy does not single out whites, African–Americans, or other minorities. For instance, at some schools, African–Americans are generally not allowed to transfer out. At other schools, white transfers are for the most part not approved. At a substantial number of schools, transfers are approved without consideration of the impact on racial or ethnic makeup of the affected schools.

Moreover, the District does not apply hard and fast quotas in deciding transfer requests. It compares the racial composition of the school with that of the County, and where it finds the percentage of a particular group below the County-wide average at a particular school, the District generally denies transfers out of that school. Significantly, the policy is not rigidly applied—transfers out of a school are permitted even for members of underrepresented groups in the case of great need or hardship. For instance, of the 19 white students that applied for transfers out of Glen Haven for the 1998–99 school year, 9 were permitted to transfer notwithstanding the increasing racial imbalance at the school.

Additionally, given that the purpose of the plan is to ensure racial and ethnic diversity of the schools of the County, the Court cannot conceive of, and Eisenberg does not suggest, any race-neutral alternatives to the policy.

Eisenberg does contend that the program is not narrowly tailored because race is the only factor considered by the County. Eisenberg points out that even in *Bakke,* Justice Powell stated that "[t]he diversity that furthers a compelling governmental interest encompasses a far broader array of qualifications and characteristics of which racial origin is but a single though important element." *Bakke,* 438 U.S. at 315, 98 S.Ct. 2733. But it must be remembered that *Bakke* dealt with admissions to medical school. The present case deals with transfers between first grade classes. It is obviously unlikely that first graders will have extensive resumes which may be weighed and considered in addition to their race in the District's formulation of how to craft

diverse classrooms. Notwithstanding the lack of classroom experience and other distinguishing credentials of these students, however, the need for a diverse classroom is equal, if not greater, than in later years. Where children first begin to forge social relationships and interactions with their peers, in the view of the Court the need for diversity is at its greatest. And, again, race is not the only factor taken into account by the District. Given that personal hardship and family unity exceptions are given without regard to the race of the student, and that transfers are only limited where they would contribute to racial isolation and segregation, it is clear that race is not dispositive.

Finally, the County engages in periodic review of the policies to insure that they are as narrow as possible. Each year, the utilization index and diversity profile for each school is reviewed and adjusted. The transfer policies are likewise closely monitored and updated where necessary.

The ultimate question of whether the program is sufficiently narrowly tailored to survive constitutional scrutiny should obviously await further factual development as to how the policy has, in fact, been implemented. However, for purposes of the present motion the Court must conclude that, on balance, the District's policies have been designed as narrowly as possible while still furthering the District's stated interests.

Accordingly, the Court does not believe that Eisenberg can show a likelihood of success on the merits of his motion.

### C. PUBLIC INTEREST

The Court must finally give consideration to the impact upon the public interest. Given the previously discussed interest in diversity in the public schools, the Court cannot say that the denial of the preliminary injunction and the maintenance of the District's policy is contrary to the public interest.

### Conclusion

Accordingly, for the reasons here stated, Eisenberg's motion for a preliminary injunction will be denied. An Order consistent with this Opinion will follow.

### ORDER

In accordance with the Memorandum Opinion, IT IS this 4th day of September, 1998, by the United States District Court for the District of Maryland, Southern Division, hereby **ORDERED**:

1. That Plaintiff's Motion for a Preliminary Injunction [2–2] BE, and the same hereby IS, **DENIED**; and

2. That the Clerk of the Court mail copies of this Order to all parties of record.