Filed:   November 19, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————————

No. 98-2503
(CA-98-2797-AW)

———————————————

Jeffrey Eisenberg, etc.,

                                        Plaintiff - Appellant,

        versus

Montgomery County Public Schools, et al,

                                        Defendants - Appellees.

———————————————

O R D E R

———————————————

        The court amends its opinion filed October 6, 1999, as follows:

        On the cover sheet, section 3, line 3 -- the district court number is corrected to read "CA-98-2797-AW."

        On page 11, first full paragraph, line 12 -- the reference to Tuttle "at 10-11" is corrected to read "at 11-12."

        On page 13, first paragraph, line 4 -- the reference to Tuttle "at 10" is corrected to read "at 11."

On page 14, first paragraph, line 1 -- the reference to <u>Tuttle</u> "at 12 & n. 11" is corrected to read "at 11 & n. 10."

On page 17, first full paragraph, line 3 -- the reference to <u>Tuttle</u> "at 12" is corrected to read "at 13."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JEFFREY EISENBERG, on behalf of
Jacob Eisenberg,
<u>Plaintiff-Appellant,</u>

and

ELINOR MERBERG, on behalf of Jacob
Eisenberg,
<u>Plaintiff,</u>

v.

No. 98-2503

MONTGOMERY COUNTY PUBLIC
SCHOOLS; PAUL VANCE, Dr.,
Superintendent, in his official and
personal capacity; MONTGOMERY
COUNTY BOARD OF EDUCATION,
Members, in their official and
personal capacity,
<u>Defendants-Appellees.</u>

UNITED STATES OF AMERICA,
<u>Amicus Curiae.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-98-2797-AW)

Argued: June 10, 1999

Decided: October 6, 1999

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Reversed and remanded with instructions by published opinion. Judge Widener wrote the opinion, in which Judge Niemeyer and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Jeffrey Eisenberg, Silver Spring, Maryland, for Appellant. Patricia Ann Brannan, HOGAN & HARTSON, L.L.P., Washington, D.C., for Appellees. Rebecca K. Troth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Maree F. Sneed, Audrey J. Anderson, HOGAN & HARTSON, L.L.P., Washington, D.C.; Judith S. Bresler, REESE & CARNEY, L.L.P., Columbia, Maryland, for Appellees. Bill Lann Lee, Acting Assistant Attorney General, Mark L. Gross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

WIDENER, Circuit Judge:

The issue in this case is whether the Montgomery County Board of Education may deny a student's request to transfer to a magnet school because of his race. We hold that it may not.

Jacob Eisenberg appeals the district court's denial of his motion for a preliminary injunction to compel his admittance to the math and science magnet program at Rosemary Hills Elementary School. Jacob originally applied for a transfer to Rosemary Hills Elementary School for the 1998-99 school year, his first grade year, and was denied his request by Montgomery County on May 15, 1998 due to the "impact on diversity." Jacob is currently preparing to enter the second grade at Glen Haven Elementary, his assigned school, based on his residence. On his transfer request application, Jacob identified his racial/ethnic group as "White, not of Hispanic origin," and accordingly, under Montgomery County's transfer policy, particularly its

2

"diversity profile,"**1** he was not allowed to transfer out of Glen Haven Elementary School. We reverse the district court's order denying Jacob's motion for a preliminary injunction and remand this case for action consistent with this opinion.

I.

Montgomery County educates more than 125,000 elementary and secondary students enrolled at over 183 schools spread throughout 500 square miles. The County has never been subject to a court order for desegregation,**2** rather, Montgomery County by its voluntary efforts dismantled the former segregated school system. One aspect of its efforts included the implementation of magnet school programs,**3** which would attract and retain diverse student enrollment on a voluntary basis to schools outside the area in which the student lives. A magnet program emphasizing math and science is located at Rose-

_____

**1** The Superintendent, Dr. Paul L. Vance, stated in his August 6, 1998 letter regarding Jacob's Transfer Appeal that "[t]he diversity profile group ... means that white students cannot transfer out of Glen Haven Elementary School unless there is a unique hardship circumstance."

**2** Likewise, there has never been a judicial finding of a constitutional violation within Montgomery County's educational setting. In 1981, however, the Office of Civil Rights investigated a parent's complaint filed against Montgomery County alleging that it was "resegregating Rosemary Hills Primary School by improperly approving student transfers ... without the approval of the Quality Integrated Education team," thereby failing to prevent minority isolation at Rosemary Hills. Montgomery County's transfer policy at issue here was adopted in response to this complaint. The fact that Rosemary Hills was the subject of the 1981 action is entirely coincidental to, and has no relevance to, the fact that the Rosemary Hills magnet school program is the subject of this case.

**3** Magnet programs offer enriched curricula emphasizing specific areas; e.g., science, math, or a foreign language. In fact, admission to Rosemary Hills magnet school is not based on merit. Montgomery County points out that if Rosemary Hills receives more transfer requests than it has seats, the names of the eligible students are placed in a lottery and selected randomly. See County Br. at 9, n.4. This being true, Jacob would not have been eligible for the lottery because he was not allowed to transfer out of Glen Haven based on his race.

mary Hills Elementary School. Montgomery County permits voluntary transfers from an assigned school to another school under certain circumstances as outlined in its School Transfer Information Booklet.[4]

Montgomery County considers, in stages, several factors in the consideration of a voluntary transfer request: first, school stability;[5] second, utilization/enrollment; third, diversity profile; and last, the reason for the request. All of the transfer applications are considered concurrently, and if the assigned school and the requested school are ruled stable, the transfer request is reviewed for utilization/enrollment. An underutilized school is operating below 80% capacity and an overutilized school is operating above 100% capacity.

_____

[4] Throughout its Transfer Booklet and its briefs, Montgomery County uses the terms "county-wide average," "average county-wide range," and in one footnote in its Reply Brief, "one-and-one-half standard deviations," to describe the method used to compare the racial/ethnic student population in each particular school to that of other schools and to the overall racial/ethnic student population enrolled in Montgomery County Public Schools. These terms are interchangeably and indistinguishably used by Montgomery County with no apparent recognition of the ordinary true meanings of each term. For instance, an average is "exactly or approximately the quotient obtained by dividing the sum total of a set of figures by the number of figures." Webster's Ninth New Collegiate Dictionary 119 (9th ed. 1985). A range is defined as "the difference between the least and the greatest values of an attribute." Webster's Ninth New Collegiate Dictionary 974 (9th ed. 1985); see also David W. Barnes, Statistics as Proof 77 (1983) (explaining a range as "the distance between the largest and smallest numbers."). A standard deviation "represents the typical [variation] from the mean or expected value for a population (or list of numbers)." David W. Barnes, Statistics as Proof 81 (1983). For our purposes in this opinion, we have assumed that each of these terms refers to the actual percentage of students in a racial/ethnic group within the student population enrolled in each of the Montgomery County Public Schools, and, as well, the percentage of students in each of the various racial/ethnic groups in the student population of the Montgomery County Public Schools, taken as a whole.

[5] Stability refers to whether the assigned school and the requested school are undergoing a boundary change, consolidation, or renovation that requires students to attend school at an alternative site or whether either school is undergoing some other change that requires the enrollment to remain stabilized.

4

The utilization factor for each school is determined prior to the receipt of transfer requests and is indicated, for each school in the system, in the Transfer Booklet. Overutilization or underutilization may affect a transfer request, in fact, Montgomery County states that these transfer request(s) usually will be denied.**6** Along with utilization, enrollment is considered to ensure that schools remain within the preferred range of enrollment.**7** If these factors are not a concern, Montgomery County looks to the diversity of the student body of the assigned and the requested schools.

A. <u>Diversity Profile</u>

According to the Transfer Booklet, "[t]ransfers that negatively affect diversity are usually denied." Students are identified according to their racial/ethnic group: African American, Asian, Hispanic, and White. Montgomery County compares the countywide percentage for each racial/ethnic group to the percentage of each group attending a particular school, and also determines whether the percentage of each racial/ethnic group in that school has either increased or decreased over the past three years. Based on that information, Montgomery County then assigns to each racial/ethnic group within each school a diversity category.**8**

Categories 1 and 2 are reserved for the racial/ethnic group populations within a school, the percentages of which are higher than the countywide percentage for that particular group. Category 1 refers to racial groups, the percentage of which is higher than the countywide percentage for that group and has increased over time rather than

_____

**6** Each school has an "O" or a "U" or a blank space (if the utilization is optimal).

**7** The preferred range of enrollment refers to the number of classes of students per grade for elementary schools. For example, 2 to 4 classes of students per grade is preferred in elementary schools. If a school with sufficient capacity fails to meet [has fewer classes than] the preferred range, transfers out of that school are usually not permitted.

**8** If the percentage of the identified racial/ethnic group within a school is within the countywide percentage for that group and is expected to remain the same for the near future, that racial/ethnic group will not be assigned a diversity category.

5

moved closer to the countywide percentage. Transfers usually will not be permitted by a student into a school with a designated category 1 for his racial/ethnic group because his racial/ethnic group percentage at that requested transfer school is already higher than the countywide percentage. Category 2 refers to racial/ethnic populations which, although higher than the countywide percentage, have tended to decline over time. Some transfers are permitted into this group. Categories 3 and 4 indicate a racial/ethnic percentage within a school that is below the countywide percentage. Category 3 is reserved for those racial/ethnic groups, the percentage of which has tended to decline over time; while category 4 includes those populations the percentage of which has tended to increase. For example, "if a particular school has had a declining white enrollment over the preceding three year period and is substantially below the average [c]ounty-wide enrollment of white students [a Category 3], the District may restrict transfers of white students out of that school because they would contribute to that school becoming racially isolated."[9] County Br. at 7. As is the County's, the diversity profile for each school is reevaluated and adjusted annually.

B. Jacob's Transfer Application

In March of 1998, Jacob's parents submitted a request that he be transferred from Glen Haven to Rosemary Hills to begin the first grade, reasoning that Jacob's "personal and academic potential" would benefit from the school's math and science emphasis. His transfer request was approved by his kindergarten teaching team. Jacob, as a white student, was part of a category 3 group at Glen

_____

[9] Jacob faced this very situation. Glen Haven, his assigned school, and Rosemary Hills, his requested school, had the following notations for utilization and for diversity profile:

| School | Utilization | African-American | Asian | Hispanic | White |
|--------|-------------|------------------|-------|----------|-------|
| Glen Haven | Overutiliz. | 1 | | 1 | 3 |
| Rosemary Hills | | | 3 | | |

6

Haven Elementary School because at the time of Jacob's transfer request, Glen Haven's student body was 24.1% white compared to the Montgomery County-wide percentage of 53.4%, and the white enrollment at Glen Haven dropped from 38.9% in 1994-95 to 24.1% in 1997-98. See Eisenberg v. Montgomery County Public Sch., 19 F. Supp. 2d 449, 451 (D. Md. 1998). On May 15, 1998, his transfer was denied. The sole reason given by Montgomery County for the denial was "impact on diversity," that is to say because Jacob was white. Jacob did not demonstrate a "unique personal hardship"[10] to obtain an exemption from the denial based on the negative impact on diversity. The Eisenbergs submitted their appeal first to the Superintendent, and then to the Board of Education, which denied the transfer request on August 26, 1998.

Jacob's parents sought declaratory and injunctive relief as well as damages on behalf of Jacob in the district court under 42 U.S.C. § 1983, the Equal Protection Clause, and under 42 U.S.C. § 2000(d). The district court denied the Eisenbergs' motion for a preliminary injunction on September 9, 1998 on the basis that the Eisenbergs made an insufficient showing of likelihood of success on the merits.[11]

_____

[10] Five white students, out of 19 who applied, were permitted to transfer out of Glen Haven for the 1998-99 school year on a personal hardship basis. Four of these transfers were permitted because the transferring student had a sibling already attending the requested school.

[11] The district court applied the Fourth Circuit's standards for injunctive relief, see Blackwelder Furniture Co. of Statesville, Inc. v. Seilig. Mfg. Co., Inc., 550 F.2d 189 (4th Cir. 1977), and first considered the threat of irreparable harm to Jacob should the court not issue an injunction, and the likely harm to Montgomery County if an injunction should be ordered, and then balanced these two interests. See Eisenberg, 19 F. Supp. 2d at 452 (citing Manning v. Hunt, 119 F.3d 254, 263 (4th Cir. 1997)). Next, the court considered the likelihood that the plaintiff would succeed on the merits noting that as the likelihood of harm to the defendant increased, the burden on the plaintiff to demonstrate likelihood of success also increased. See Eisenberg, 19 F. Supp. 2d at 452. Finally, the court accounted for the public interest. See Eisenberg, 19 F. Supp. 2d at 452.

In this instance, the district court concluded that the balance of hardships favored Montgomery County, though only slightly. Thus, the court looked to the Eisenbergs to make a strong showing regarding their likelihood of success on the merits. Finding none, the district court denied their motion for preliminary injunction.

7

The district court concluded that Montgomery County's asserted interests in both the diversity of its student body and avoidance of potential segregative enrollment patterns were each sufficiently compelling governmental interests to justify the transfer policy's race based classifications under a "strict scrutiny" review applied in Equal Protection cases.[12] See Eisenberg, 19 F. Supp. 2d at 453-54. The district court further concluded that the transfer policy had "been designed as narrowly as possible while still furthering [Montgomery County's] stated interests." Eisenberg, 19 F. Supp. 2d at 455.

Following the denial of the preliminary injunction, the Eisenbergs appealed to this court and Jacob entered the first grade at his assigned school, Glen Haven. We review the denial of the preliminary injunction de novo since the district court based its decision solely on a premise and interpretation of the applicable rule of law and the facts are established. See Williams v. United States Merit Sys. Protection Bd., 15 F.3d 46, 48 (4th Cir. 1994).

II.

"Race is the perpetual American dilemma." J. H. Wilkinson, III, From Brown to Bakke 8 (1979). Once again, we find ourselves addressing a most difficult issue in the familiar setting of our public schools. The facts also appear all too familiar-- a child has been denied access to a state funded educational opportunity because of the color of his skin.[13] In this case there is no denial that racial classifications result in the denial of a certain number of transfers because Montgomery County fears racial imbalance within its schools, and to

_____

[12] The district court said that it applied the strict scrutiny review fashioned in Richmond v. Croson, 488 U.S. 469, 493 (1989) (plurality opinion). "A challenged policy or decision can survive such `strict scrutiny' review only if it is justified by a `compelling governmental interest' and is `narrowly tailored' to accomplish that goal." Eisenberg, 19 F. Supp. 2d at 452.

[13] Although the Montgomery County transfer policy uses the same method in considering all students within all racial/ethnic groups, at the individual school level, an African American student may be denied access due to his category designation, where a White student would be granted his transfer request, and vice versa.

8

combat this potential problem, Montgomery County employs a race-conscious nonremedial transfer policy which amounts to racial balancing.

A.

Initially, the district court erred when it failed to adhere to, or even to mention, the presumption against race based classifications. See Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979) ("racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only on extraordinary justification."). In Podberesky v. Kirwan, (Podberesky II), a case involving an exclusively African-American scholarship program at the University of Maryland, we emphasized that presumption and "the constitutional premise that race is an impermissible arbiter of human fortunes," even when using race as a "reparational device" or as a "remedial measure" for past discrimination. 38 F.3d 147, 152 (4th Cir. 1994), cert. denied, Kirwan v. Podberesky, 514 U.S. 1128 (1995); Maryland Troopers Ass'n, Inc. v. Evans, 993 F.2d 1072, 1076 (4th Cir. 1993). In accordance with that principle, we concluded that government institutions that choose to employ racial classifications face "the presumption that [such a] choice can not be sustained." Podberesky II, 38 F.3d at 152. Montgomery County was burdened with this presumption, and although the district court analyzed the transfer policy under strict scrutiny review, it failed to take the presumption into account when it denied Jacob's request for a preliminary injunction. There is nothing in the record to overcome this presumption.

B.

It is undisputed that the transfer policy considers race as the sole determining factor, absent a "unique personal hardship," if the assigned school and the requested school are both stable and their utilization/enrollment factor are acceptable for transfers. While whites and non-whites are not singled out for different treatment, they are all subject to being denied a transfer request solely on the basis of their race. Any racial classification, including that present here, must survive strict scrutiny review; failing such review manifests a violation of Jacob's constitutional rights.[14] See Adarand Constructors, Inc. v.

_____

[14] In its review of Jacob's asserted irreparable harm, the district court stated that, if proven, a violation of Jacob's constitutional rights consti-

9

Pena, 515 U.S. 200, 227 (1995). Strict scrutiny review requires the racial classification to serve a compelling governmental interest and be narrowly tailored to achieve that interest. See Adarand, 515 U.S. at 227. The diversity profile factor of the transfer policy employs such racial classifications which "are simply too pernicious to permit any but the most exact connection between justification and classification." Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 280 (1986) (quoting Fullilove v. Klutznick, 448 U.S. 448, 537 (1980) (Stevens, J., dissenting)).

The district court's determination that the Eisenbergs did not have a strong likelihood of success on the merits stemmed from its strict scrutiny review. The district court labeled its review as exacting and determined that each of the two interests advanced by Montgomery County were sufficiently compelling; the first interest in avoiding the creation of segregative enrollment by racial isolation, and the second interest in promoting a diverse student population. See Eisenberg, 19 F. Supp. 2d at 452-55. A further examination of these two interests, and application of this court's reasoning in our recent case regarding racial classifications within an elementary school setting, Tuttle v. Arlington County Sch. Bd., No. 98-1604 (4th Cir. Sept. 24, 1999), reveals that Montgomery County's transfer policy cannot pass constitutional muster.

Moreover, we believe the district court erred in its finding that the Eisenbergs are not likely to succeed on the merits, given that the record demonstrates that Montgomery County's transfer policy is not a remedial race-conscious policy. See Eisenberg, 19 F. Supp. 2d at 451-52. Montgomery County has never been under a court order to desegregate, having acted voluntarily to dismantle segregation after the Supreme Court's decision in Brown v. Board of Educ., 347 U.S. 483 (1954). See Eisenberg v. Montgomery County Public Sch., 19 F. Supp. 2d at 451; County Br. at 4. Montgomery County formed a

_____

tutes per se irreparable harm. See Eisenberg, 19 F. Supp. 2d at 452 (citing Johnson v. Bergland, 586 F.2d 993, 995 (4th Cir. 1978); Henry v. Greenville Airport Comm'n, 284 F.2d 631, 632-33 (4th Cir. 1960)). The district court found the irreparable harm to be slight and balanced the hardships in favor of Montgomery County.

10

Quality Integrated Education policy in 1975,[15] and the present transfer policy reflects the Quality Integrated Education policy goals of "avoiding racial isolation and promoting diverse enrollments." See County Br. at 4. Notwithstanding that race based classifications have been tolerated in situations where past constitutional violations require race based remedial action, see Swann v. Charlotte Mecklenburg Bd. of Educ., 402 U.S. 1 (1971); Brewer v. School Bd. of City of Norfolk, 456 F.2d 943 (4th Cir.), cert. denied, School Bd. of City of Norfolk v. Brewer, 406 U.S. 933 (1972), we do not face that type of scenario in this case. No court has ever made a finding that Montgomery County Public Schools were not unitary, therefore, the transfer policy does not correct any past constitutional violations.

III.

We next examine whether a compelling governmental interest exists. Although Montgomery County advances two interests, each of which it argues constitutes a sufficiently compelling state interest under strict scrutiny, we are of opinion that, despite the different nomenclature, these interests are one and the same. [16] See Brewer v. West Irondequoit Cent. Sch. Dist., 32 F. Supp. 2d 619, 627 (W.D.N.Y. 1999) (describing the avoidance of racial isolation as "a negatively-phrased expression for attaining the opposite of racial isolation which is racial diversity."). Tuttle notes that whether diversity is a compelling governmental interest remains unresolved, and in this case, we also choose to leave it unresolved. See Tuttle, No. 98-1604, slip op. at 11-12 (4th Cir. Sept. 24, 1999); but see Hopwood v. Texas, 78 F.3d 932, 944 (5th Cir. 1996), reh'g en banc denied, 84 F.3d 720

_____

[15] Montgomery County asserts that the Quality Integrated Education policy was part of the voluntary effort to support integrated schools. This policy was adopted more than 20 years after Brown, and we note that today, over 45 years have passed since Brown.

We especially note that at about the time of inception of the transfer policy, 1981, a complaint of the U. S. Department of Education was that the "racial balance" was being upset in certain schools by the county transfer policy. This was prior to Freeman, infra, of course.

[16] The district court considered each interest separately and concluded that each was sufficiently compelling to justify the questioned policy. See Eisenberg, 19 F. Supp. 2d at 453-54.

11

(5th Cir.), cert. denied, 518 U.S. 1033 (1996) (holding that "consideration of race or ethnicity by the [University of Texas] law school for the purposes of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment."). We will assume, without holding, as the Tuttle court assumed,[17] that diversity may be a compelling governmental interest, and proceed to examine whether the transfer policy is narrowly tailored to achieve diversity. See Tuttle, No. 98-1604, slip op. at 11-12 (4th Cir. Sept. 24, 1999). No inference may here be taken that we are of opinion that racial diversity is a compelling governmental interest.

The present case and Tuttle are nearly indistinguishable in that both involve public school policies, here the Montgomery County transfer policy and in Tuttle, the Arlington County admissions policy for the Arlington Traditional School, in place "not to remedy past discrimination, but rather to promote racial [and] ethnic" diversity. Tuttle, No. 98-1604, slip op. at 3 (4th Cir. Sept. 24, 1999). Even in the remedial

_____

[17] The First Circuit assumed that diversity may suffice as compelling without so holding, see Wessmann v. Gittens, 160 F.3d 790 (1st Cir. 1998) (declining to decide, in the context of a race based admissions program to one of Boston's better public secondary schools, that diversity can never be a compelling state interest but, instead, determining that it was not narrowly tailored to achieve the desired end). Other circuits have faced related issues in different circumstances, see Taxman v. Board of Educ. of the Township of Piscataway, 91 F.3d 1547 (3d Cir. 1996) (refusing to find support in the Court's Equal Protection cases for the notion that diversity or affirmative action were sufficient justifications for making race a factor in the termination decision of one of two equally qualified teachers in a nonremedial situation under Title VII); Lutheran Church-Missouri Synod v. Federal Communications Comm'n, 141 F.3d 344 (D.C. Cir. 1998) (holding that "diversity of programming" was an insufficient justification to uphold aspects of the FCC's licensing program (which, in essence, pressured stations to maintain a workforce that mirrored the racial composition of their area) under strict scrutiny's compelling state interest test); McNamara v. City of Chicago; 138 F.3d 1219, 1222 (7th Cir. 1998) (referring to the issue as unsettled.). We should not leave the various opinions of the courts of appeal without noting that Lutheran Church also reasoned that ". . . it is impossible to conclude that the government's interest, no matter how articulated, is a compelling one." 141 F.3d at 355.

12

context, where the state-sponsored program or policy exists to remedy the proximately caused present effects of past discrimination, we have not decided the question of whether diversity is a compelling governmental interest. See Tuttle, No. 98-1604, slip op. at 11 n. 7 (4th Cir. Sept. 24, 1999) (citing Alexander v. Esteep, 95 F.3d 312, 316 (4th Cir. 1996); Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207, 213 (4th Cir. 1993) (holding that there was insufficient evidence to prove that race based promotion to achieve racial diversity was a compelling interest); Podberesky v. Kirwan, 956 F.2d 52, 56 n.4 (4th Cir. 1992) (Podberesky I)). Similarly, the Supreme Court has not decided this issue. See Regents of Univ. of California v. Bakke, 438 U.S. 265, 269 (1978). We thus do not decide that racial/ethnic diversity is a compelling state interest and proceed to the second part of the strict scrutiny analysis.

IV.

This court's mention of Bakke in Talbert v. City of Richmond[18] does not lead us to conclude that Montgomery County's use of racial classifications in its transfer decisions is narrowly tailored to the interest of obtaining diversity. In fact, we find that it is mere racial balancing in a pure form, even at its inception. The County annually ascertains the percentage of enrolled public school students by race on a countywide basis, and then does the same for each school. It then assigns a numbered category for each race at each school, and administers the transfer policy so that the race and percentage in each school to which students are assigned by residence is compared to the percentage of that race in the countywide system. The transfer policy is administered with an end toward maintaining this percentage of racial balance in each school. This is, by definition, racial balancing. As we have only recently held in Tuttle "[s]uch nonremedial racial balancing

_____

[18] Talbert v. City of Richmond, 648 F.2d 925, 931 (4th Cir. 1981), involved police officer promotion and stated that "the attainment of racial diversity in the top ranks of the police department was a legitimate interest of the city." In Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993), however, we held that legitimate is not necessarily compelling. 10 F.3d at 213 ("We did not determine that the interest was sufficiently `compelling' to justify racial classifications under the strict scrutiny standard.").

is unconstitutional." <u>Tuttle</u>, No. 98-1604, slip op. at 13 & n.10 (4th Cir. Sept. 24, 1999). Montgomery County's transfer policy, at its inception, was to "further provide[ ] for transfers ... providing that the transfer does not adversely affect the <u>racial balance</u> in either the sending or the receiving school." Letter from U. S. Department of Education to Superintendent Andrews, Feb. 28, 1981 (italics added). Although the transfer policy does not necessarily apply "hard and fast quotas,"[19] its goal of keeping certain percentages of racial/ethnic groups within each school to ensure diversity is racial balancing.[20]

The Court dealt with the issue of nonremedial racial pupil assignment in both <u>Pasadena Bd. of Educ. v. Spangler</u>, 427 U.S. 424 (1976), and <u>Freeman v. Pitts</u>, 503 U.S. 467 (1992). In <u>Spangler</u>, the Supreme Court affirmed the Ninth Circuit's finding that it would be beyond the remedial authority of the district court to require the annual readjustment of school attendance zones to counteract changes in the racial makeup of the schools.[21] <u>See Spangler</u>, 427 U.S. at 436.

_____

[19] The district court pointed to the fact that some transfers are allowed based on "personal hardship and family unity" as evidence that the transfer policy was not rigidly applied. <u>See Eisenberg</u>, 19 F. Supp. 2d at 455. This does not detract from the wrong done by denial of a transfer, as here, on the basis of race.

[20] Although the district court decided that, in its opinion, diversity was a compelling governmental interest, its finding that "the [county] does not apply hard and fast quotas" is a tacit acknowledgment that if such were the case, its decision would have been different. <u>Eisenberg</u>, 19 F. Supp. 2d at 454. The fact that, for any reason personal to him, only a distinct personal hardship can save any student, regardless of his race, from having his transfer request decided on the basis of race, makes it tempting to decide the general question of whether or not diversity is a compelling governmental interest. However persuasive the arguments, and however tantalizing the facts in this case are, we resist that temptation and do not decide the question because it is not absolutely necessary to our decision. See <u>Ashwander v. TVA</u>, 297 U.S. 288, 341, 346-47 (1936) (Brandeis, J., concurring).

[21] Clearly, Montgomery County has not been found to initially assign students to schools based on race, rather students are assigned by residence. Nonetheless, Montgomery County is attempting to keep schools racially balanced by controlling and monitoring transfers. Jacob's request to transfer to Rosemary Hills is one of them.

14

In the Ninth Circuit's subsequent opinion in Spangler v. Pasadena Bd. of Educ., the court recognized the Supreme Court's emphasis on the idea "that when a large percentage of minority students in a neighborhood school results from housing patterns for which school authorities are not responsible, the school board may not be charged with unconstitutional discrimination if a racially neutral assignment method is adopted." 611 F.2d 1239, 1244 (9th Cir. 1979). Thus, in the situation before us, if racial isolation, meaning low or high percentages of either racial minorities or non-minorities may be feared because transfer requests are granted to students when the assigned and requested schools are both stable and at appropriate utilization levels, any found racial imbalance would not be a vestige of a prior de jure system. If racial imbalance occurs in some of the Montgomery County schools because students like Jacob, for example, are permitted to transfer to magnet schools to get a better education, any racial or ethnic imbalance is a product of "private choices [and] it does not have constitutional implications." Freeman v. Pitts, 503 U.S. 467, 495 (1992).

In Freeman, racial disparities surfaced because of great growth in the DeKalb area after 1986; from 70,000 to 450,000 and the attraction of African-Americans to the area contributed to a racial imbalance within the school district after the district had been declared unitary in the student assignment area. 503 U.S. at 480. In this case, Montgomery County has implemented magnet schools to attract students of all racial/ethnic backgrounds to be a part of a different learning environment. Predictably, students of all backgrounds are attracted to the magnet school and, as a result, racial imbalance may then occur in some other schools, if it occurs at all. A potential racial imbalance does not, however, justify the transfer policy's use of race as a factor to determine eligibility for transfers.[22]

The fact that the "County engages in periodic review ... [and the] diversity profile for each school is reviewed and adjusted" each year to avoid the facilitation and the creation of a racially isolated environment does not make the policy narrowly tailored. See Eisenberg, 19

_____

[22] Montgomery County is not required to grant transfers, but nonetheless, it may not refuse to grant such requests to achieve a racial makeup in each school mirroring the county's racial makeup.

15

F. Supp. 2d at 455. Instead, it manifests Montgomery County's attempt to regulate transfer spots to achieve the racial balance or makeup that most closely reflects the percentage of the various races in the county's public school population. Periodic review does not make the transfer policy more narrow. Similarly, because a student may be granted a transfer request because he can demonstrate a unique personal hardship[23] does not limit or narrow the transfer policy so that racial balancing is suddenly a narrow fit to achieve diversity. It is true that the racial/ethnic background is not the only factor in transfer request considerations, however, in Jacob's situation, his race was the only factor that led to the denial of his request. Montgomery County admits that it denies transfer requests solely on the basis of race, absent personal hardship, "where the consideration of the racial/ethnic diversity factor is reached" and the transfer would contribute to racial isolation. County Br. at 8.

In Tuttle, one of the reasons for holding that the admissions policy in question in that case was invalid was that it "skew[ed] the odds of selection in favor of certain minorities." No. 98-1604, slip op. at 15 (4th Cir. Sept. 24, 1999). The Montgomery County transfer policy does not allow every applicant for a transfer to be eligible for every available spot. Here Rosemary Hills was stable and was not overutilized and Glen Haven was stable and overutilized, yet spots at Rosemary Hills were foreclosed to Jacob simply because Glen Haven's percentage of white school population would decrease, which would cause a greater departure from the countywide percentage for the white student population. If Jacob had been African-American or Asian or Hispanic, he would have been granted his transfer request from Glen Haven to Rosemary Hills because his transfer would not have caused a racial imbalance at Glen Haven. It does not matter that, as the County argues, "at some schools, African-Americans are generally not allowed to transfer out" and that the "policy does not single out whites, African-Americans, or other minorities," a denial of transfer to African-Americans or other minorities on account of their race is no less unconstitutional than the denial to Jacob was here. An example makes clear the evil of the system in place. Suppose an

_____

**23** The personal hardship exemption, among other things, refers to allowing a transfer to keep siblings in the same school and ease the burden on families.

16

African-American and an Hispanic student at Travilah Elementary School (J.A. 20) wanted to transfer to Rosemary Hills (J.A. 20) to participate in the magnet program of math and science and get a better education. Their diversity profile numbers being category 3, the same as Jacob's, their transfers would likewise have been refused because of their race. The fact that these two theoretical students would have been unconstitutionally denied a transfer does not ameliorate the fact that Jacob's denial was invalid. As Justice Scalia put it in his concurring opinion in Adarand:

> Individuals who have been wronged by such unlawful racial discrimination should be made whole; but, under our Constitution, there can be no such thing as either a creditor or debtor race. That concept is alien to the Constitution's focus upon the individual. . . .

515 U.S. at 239.

V.

To summarize, Montgomery County's transfer policy here in question is engaging in racial balancing, which we have just held to be unconstitutional in Tuttle. In Tuttle, No. 98-1604, slip op. at 13 (4th Cir. Sept. 24, 1999), and Podberesky v. Kirwan, 38 F.3d 147, 160 (4th Cir. 1994), we also held that racial balancing was not a narrowly tailored remedy. Therefore, even if we went no further, the complained of action on the part of Montgomery County would have to be invalidated because it was giving effect to an unconstitutional policy.

But that is not all. Added to the racial balancing is the fact that Jacob's transfer request was refused because of his race. As we have pointed out, such race based governmental actions are presumed to be invalid and are subject to strict scrutiny. Nothing in this record overcomes that presumption.

On remand the district court will forthwith enter its preliminary injunction requiring the school authorities in Montgomery County to admit Jacob to the Rosemary Hills Elementary School magnet program to which he had applied. Following that, the district court will

17

enter its final injunction requiring the school authorities in Montgomery County to reconsider the application of Jacob to transfer to the Rosemary Hills Elementary School magnet program without consideration of his race. Such consideration will re-examine that request for admission "as of the date it was made." Podberesky II, 38 F.3d at 162.

We are justified in requiring the entry of an injunction finally disposing of this case without an evidentiary hearing because the record clearly establishes the plaintiff's right to an injunction and such a hearing would not have altered the result. See Lone Star Steakhouse & Saloon v. Alpha of Virginia, 43 F.3d 922, 938 (4th Cir. 1995). This is so because no fact on which we have based our opinion is challenged and in this case we have the compound constitutional wrongs of an invalid racially based transfer policy sustaining invalid racial balancing.

Our decision is very narrow. We feel that we should point out what is not decided. See Loving v. Alexander, 745 F.2d 861, 867 (4th Cir. 1984). We have not enjoined any aspect of the transfer policy of Montgomery County except that it may not consider the race of the applicant in granting or denying the transfer. We have not decided that diversity, as the term is used here, either is or is not a compelling governmental interest. The absence of any rigid academic qualifications for transfer and selection by lot if a surplus of applications, for example, seem to open the opportunity to transfer to magnet schools to all students in the system, without respect to their race or any other qualification except their implicit desire to obtain a better education. Desire is not race based. Nothing in this record would indicate that the other aspects of the transfer policy--stability, utilization, enrollment and personal hardship--are race based, and we do not disturb them.

REVERSED AND REMANDED WITH INSTRUCTIONS

18